Filed 1/15/21

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS ALEJANDRO MONTES,<br><br>    Defendant and Appellant. | F078357<br><br>(Super. Ct. No. BF172138A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*       Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I. and II. of the Discussion.

**SEE CONCURRING AND DISSENTING OPINION**

# INTRODUCTION

Defendant Carlos Alejandro Montes drove a stolen semitruck (semi) and trailer to a wholesale tire business, broke into the fenced yard and began taking tires. Defendant was still on the premises when police arrived and he then drove the semi at multiple officers, led police on a high-speed chase, and fled on foot after eventually crashing the semi into a wall.

This course of conduct resulted in a litany of charges and defendant was convicted by a jury of the following 13 crimes: five counts of assault on a peace officer with a deadly weapon (Pen. Code, § 245, subd. (c); counts 1, 4–6 & 9),[1] two counts of vandalism (§ 594, subd. (b)(1); counts 3 & 10), one count of evading a peace officer while driving recklessly (Veh. Code, § 2800.2; count 7), one count of evading a peace officer by driving against traffic on a highway (Veh. Code, § 2800.4; count 8), one count of driving or taking a vehicle (Veh. Code, § 10851, subd. (a); count 12), one count of receiving a stolen vehicle (§ 496d, subd. (a); count 13), one count of assault with a deadly weapon (§ 245, subd. (a)(1); count 14), and one misdemeanor count of petty theft (§ 488; count 15).[2] In a bifurcated proceeding, the trial court found true that defendant served one prior prison term within the meaning of section 667.5, former subdivision (b), and that he had prior convictions for violating Vehicle Code section 10851, subdivision (a), for the purpose of applying the alternate sentencing scheme under section 666.5, subdivision (a), to counts 12 and 13.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] On the prosecutor's motion after the close of evidence, count 2 (grand theft of tires) was dismissed, count 11 (assault on Officer Otterness) was dismissed as duplicative of count 6, count 15 (petty theft of tires) was added to the Information by interlineation, and the sentence enhancement under section 12022, subdivision (b)(1), for personal use of a deadly or dangerous weapon, attached to counts 1, 4, 5, 6 and 9, was dismissed.

The trial court sentenced defendant to a total determinate term of 13 years 4 months in prison.[3] Selecting count 1 as the principal term, the court imposed the upper term of five years for assault on a peace officer with a deadly weapon. On the remaining felony counts, the trial court imposed one-third of the middle term, to run consecutively, as follows: eight months each on count 3 and count 10 for vandalism, 16 months each on counts 4 through 6 and 9 for assault on a peace officer with a deadly weapon, eight months on count 8 for reckless evasion of a peace officer while driving against traffic, and one year on count 12 for driving or taking a vehicle. The court also imposed a concurrent term of 180 days on count 15 for petty theft and, pursuant to section 654, imposed the upper term of three years, stayed, on count 7 for reckless evasion of a peace officer and upper terms of four years each, stayed, on counts 13 and 14 for receiving a stolen vehicle and assault with a deadly weapon. In addition, the trial court imposed a minimum restitution fine of $300 under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $300 under section 1202.45, subdivision (a), stayed; a crime prevention fine of $10 under section 1202.5; a total court operations assessment of $520 under section 1465.8; and a total court facilities assessment of $390 under Government Code section 70373.

Defendant claims that his conviction for violating Vehicle Code section 10851, subdivision (a), must be reversed because he cannot be convicted of both taking and receiving the same property, and that his sentence for vandalism on count 10 must be stayed under section 654 because the damage to the semi underlying that conviction occurred during the course of his flight from police underlying his conviction on count 8. Defendant also claims, in accordance with the postsentencing decision in *People v.*

---

[3]    The record reflects that the trial court struck the prior prison term enhancement after the sentencing hearing and we note that pursuant to Senate Bill No. 136, effective January 1, 2020, defendant's prior convictions no longer qualify for the purpose of the enhancement under section 667.5, subdivision (b). (Stats. 2019, ch. 590, § 1, pp. 1–4.)

*Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), that he is entitled to relief from the fines and assessments imposed until and unless the People demonstrate he has the ability to pay.

The People dispute defendant's entitlement to any relief on his claims.

We conclude that while the trial court erred when it instructed the jury on Vehicle Code section 10851, subdivision (a), and section 496d, subdivision (a), the error was harmless because defendant's conviction on count 12 may be construed as based on posttheft driving. We also reject defendant's challenge to the sentence on count 10 under section 654. However, with respect to defendant's *Dueñas* claim, we conclude that defendant did not forfeit review of his claim and on this undeveloped record, it is appropriate to remand the matter for the limited purpose of allowing the parties to address the issues and make a record. Finally, in the event that there is no change to the judgment following proceedings on defendant's ability-to-pay claim, we order the trial court, on our own motion, to correct the abstract of judgment to reflect imposition of a total court operations assessment of $520 under section 1465.8 and a total court facilities assessment of $390 under Government Code section 70373. (*People v. Leon* (2020) 8 Cal.5th 831, 855; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## FACTUAL SUMMARY[4]

Sometime on May 1, 2018, the owner of a trucking company left his Peterbilt semi with an attached trailer at a repair shop in the 3600 block of East Brundage Road in Kern County. The truck was locked with the windows rolled up, but the owner left a "hide-a-key" so mechanics could access the semi.

At approximately 4:00 a.m. on May 2, 2018, an onsite employee monitoring the surveillance cameras at a tire wholesale business in the 3900 block of East Brundage Road observed a semi with attached trailer arrive at the yard of the business next door.

---

**4** The defense rested without presenting evidence.

4.

The driver detached the trailer, positioned the truck by a different trailer, and used that trailer to knock down the fence into the tire wholesaler's yard, causing approximately $1,000 in fence damage. The individual then entered the tire wholesaler's yard on foot and began throwing tires into the yard next door. After the employee called 911, multiple officers with the Bakersfield Police Department responded to the scene.

Officer Dalton parked his patrol car and, on foot, entered the yard where the semi was idling. He saw an individual loading tires onto a trailer. Officer Barrier was driving the first patrol vehicle to enter the driveway area between two tall steel buildings. The approximately 40-foot opening was secured by two chain-link fence gates that met in the middle, each approximately 20 feet wide and 8 feet high. One of the gates was wide open and damaged. As Dalton used his flashlight to direct Barrier into the yard and toward the semi, the semi began moving forward. Barrier lit up the cab of the semi with his spotlight, but the semi's speed increased so Barrier activated his forward-facing red light. The semi continued to pick up speed and Barrier floored his gas pedal to get out of the way. The semi then made a wider turn and continued toward Barrier, who had to again floor his vehicle's gas pedal to get out of the way.

After missing Officer Barrier's vehicle by a couple of feet, the semi accelerated toward Officer Dalton, who was standing between the semi and the exit gate. Dalton was unable to move out of the fenced area in time so he backed up to a building wall, pulled his firearm and lit up the cab of the semi with the bright light attached to the firearm. Dalton made eye contact with the driver, whom he identified as defendant, but he did not fire because he was unsure where the other officers were located. The semi missed hitting Dalton by approximately two feet and continued through the gate.

Officer Otterness was entering the driveway area in his patrol vehicle and as he passed a blind spot, he saw the semi heading straight for him but he was between the two buildings and had nowhere to go so he stopped his vehicle. He could see the cab lift as the driver, whom he also identified as defendant, shifted gears, and he estimated the semi

was going between 30 and 40 miles per hour. Otterness felt his life was in danger and he aimed his firearm at the semi but did not fire. The semi came within ten to 15 feet of him before it swerved and hit the closed gate on its way out of the yard.

Officer Puryear was parked on the street on the other side of the closed gate with his lights off and the passenger side of his vehicle facing the oncoming semi. He saw the semi swerve toward Officer Otterness's patrol vehicle and Officer Dalton running away. Puryear heard the semi accelerate and saw it lift as the driver shifted gears and headed for the gate. Puryear estimated the semi was going 30 to 40 miles per hour and as the semi hit the gate, Puryear accelerated his vehicle out of the way to avoid being hit.

Multiple officers followed the semi as it took off down East Brundage Road, including Officers Dalton, Barrier, Otterness and Puryear. The ensuing vehicle pursuit lasted approximately 10 minutes and covered four miles. During that time, the driver ran several stop signs and red stoplights; reached speeds of 90 miles per hour on streets with speed limits of 25, 35 and 45 miles per hour; hit at least one parked vehicle; and drove on the wrong side of the road against traffic. At no time did the driver brake or yield to pursuing officers.

Officer Dalton was "parallel" assisting, which involved clearing intersections along the pursuit route to ensure vehicle and pedestrian safety. At one point during the pursuit, Dalton was blocking an alleyway with his patrol vehicle when the semi swerved toward him. He dove into the passenger side of his vehicle and the semi came within one foot of it while traveling approximately 50 miles per hour. Dalton heard gravel from the road spray his patrol vehicle as the semi passed.

The pursuit ended when the semi hit the seven to eight foot cinderblock wall of a residential property, disabling the semi and causing damage to it that cost the trucking

6.

company owner approximately $11,000 to fix.[5]  The collision kicked up a cloud of dust and by the time officers approached the semi, the driver was gone.

After hearing the sound of a loud collision or explosion and hearing police, a nearby resident just off Beverly Drive went outside to his front porch.  He saw a man come through the gate from his neighbor's backyard.  The man took off his black jacket, slung it over the fence and walked down the street toward Beverly Drive.

The resident approached Officer Romo as he searched the area and reported what he saw.  Approximately eight minutes after the collision, Romo located defendant, who matched the description given by the resident, walking northbound on Beverly Drive.  Defendant appeared hesitant and fidgety.  Defendant gave his name and said he had been visiting a friend but did not provide the friend's name, address or street name.  He was also sweating profusely and told Romo he had been wrestling with his friend.  After defendant was detained, the resident who saw someone exit his neighbor's backyard and leave a jacket behind identified defendant.

Another resident who lived a few houses down from where the jacket was found slung over the fence called 911 and reported seeing someone via surveillance camera place keys inside the mailbox.  Police located a set of keys inside the resident's mailbox that included a Peterbilt key.

---

[5]     The owner testified that after receiving an estimate of almost $48,000 from a repair shop, he fixed the semi himself over the course of six weeks at a cost of approximately $11,000.  He described the semi, which had been in perfect condition prior to the theft, as "wrecked" when he got it back.

## DISCUSSION

### I.      Dual Convictions for Taking and Receiving Stolen Vehicle[*]

#### A.      Background

It has long been established that a defendant may not stand convicted of both stealing and receiving the same property.  (*People v. Ceja* (2010) 49 Cal.4th 1, 4–5 (*Ceja*); *People v. Garza* (2005) 35 Cal.4th 866, 871 (*Garza*); *People v. Jaramillo* (1976) 16 Cal.3d 752, 758.)  This rule of common law, codified in some statutes although not in section 496d (*Garza*, *supra*, at pp. 874–875; § 496, subd. (a)), derives from "the notion that it is 'logically impossible for a thief who has stolen an item of property to buy or receive that property from himself[]'" (*Ceja*, *supra*, at pp. 4–5, quoting *People v. Allen* (1999) 21 Cal.4th 846, 854).  If a defendant is erroneously convicted of taking and receiving the same property, the practice is to reverse the receiving conviction.  (*Ceja*, *supra*, at pp. 9–10 & fn. 9.)

Vehicle Code section 10851, however, "sweep[s] more broadly than 'theft,' as the term is traditionally understood.  [The statute] punishes not only taking a vehicle, but also driving it without the owner's consent, and 'with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle.'"  (*People v. Page* (2017) 3 Cal.5th 1175, 1182 (*Page*), quoting Veh. Code, § 10851, subd. (a), italics omitted; accord, *People v. Bullard* (2020) 9 Cal.5th 94, 102–103; *People v. Lara* (2019) 6 Cal.5th 1128, 1136.)[6]

---

[*]      See footnote, *ante*, page 1.

[6]      Vehicle Code section 10851, subdivision (a), provides in full:  "Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an accessory to or an accomplice in the driving or unauthorized taking or stealing, is guilty of a public offense and, upon conviction thereof, shall be punished by imprisonment in a county jail for not more than one year or pursuant to subdivision (h) of Section 1170 of the Penal Code or by a fine of not more than five thousand dollars ($5,000), or by both the fine and imprisonment."

Thus, relevant to defendant's claim, the statute criminalizes both taking and driving a vehicle without consent.

Defendant asserts that his conviction on count 12 for violating Vehicle Code section 10851, subdivision (a), was based on a theft theory and, therefore, he cannot be convicted of both taking and receiving the same stolen property. The People agree defendant may not be convicted of both taking and receiving the semi, but argue that given the strong evidence of posttheft driving, both convictions may be upheld by construing defendant's conviction on count 12 as one for posttheft driving under Vehicle Code section 10851, subdivision (a). On the facts of this case, we agree with the People. (*Garza*, *supra*, 35 Cal.4th at p. 882; *People v. Calistro* (2017) 12 Cal.App.5th 387, 404–405 (*Calistro*).)

### B.    Analysis

#### 1.    Instructional Error Occurred

Although defendant does not delve into instructional error, that is the root of the problem here. "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953; accord, *People v. Molano* (2019) 7 Cal.5th 620, 667; *People v. Mitchell* (2019) 7 Cal.5th 561, 586.) "We review de novo the question of whether a jury instruction correctly states the law." (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 465, citing *People v. Posey* (2004) 32 Cal.4th 193, 218; accord, *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

In *Ceja*, the California Supreme Court addressed the trial court's instructional duty as to the prohibition against dual convictions for stealing and receiving the same property. (*Ceja*, *supra*, 49 Cal.4th at p. 10.) The court held that "juries should be instructed to reach a verdict on the theft charge first when the defendant is also charged with receiving the stolen property. A guilty verdict on the theft charge makes it

9.

unnecessary to consider the receiving charge. This practice … ensure[s] that the statutory ban against dual convictions is applied." (*Ibid.*) In addition, by the time the crimes in this case were committed in 2018, the California Supreme Court had issued its decision in *Page*, holding that "obtaining an automobile worth $950 or less by theft … is punishable only as a misdemeanor, regardless of the statutory section under which the theft was charged." (*Page*, *supra*, 3 Cal.5th at p. 1187.)

The record does not indicate there was any discussion regarding the prohibition against dual convictions for taking and receiving the same property or regarding the decision in *Page*. The jury was instructed it had to determine whether the value of the semi was more than $950 only as to count 13 for receiving stolen property. Although defense counsel requested the same instruction be given on count 12 for taking or driving the semi, she relied on appellate case authority for the proposition that the instruction was necessary to determine whether the crime was a misdemeanor or a felony, and that the instruction was relevant to taking but not driving.[7] The prosecutor disagreed but requested a unanimity instruction and an amendment to the verdict form to allow the jury to make a finding of taking versus driving. The trial court denied the parties' requests, concluding that any further instruction would direct the jury to make findings not required under the law and would possibly be more confusing than helpful.[8]

---

[7]    After defendant was convicted in this case, the California Supreme Court concluded that Proposition 47, and its felony/misdemeanor distinction between property valued at greater than $950 and property valued at $950 or less, does not apply to convictions for receiving stolen property under section 496d. (*People v. Orozco* (2020) 9 Cal.5th 111, 122–123.)

[8]    CALCRIM No. 1820 was revised in September 2018 and now includes value as an element of theft with intent to permanently deprive the owner of possession or ownership. More recently, the California Supreme Court rejected the argument that for the purpose of applying Proposition 47, there is a distinction between permanent and temporary takings (*People v. Bullard*, *supra*, 9 Cal.5th at p. 109), and held that "[e]xcept where a conviction is based on posttheft driving …, a violation of [Vehicle Code] section 10851 must be punished as a misdemeanor theft offense if the vehicle is worth $950 or less[]" (*id.* at p. 110). The trial court instructed the jury with the earlier version of CALCRIM No. 1820 then in effect, which did not include value as an element, but addressed the dual conviction prohibition in the Bench Notes.

The failure to instruct the jury that it had to find the vehicle's value as an element of felony taking (*Page*, *supra*, 3 Cal.5th at p. 1187), and that it could not convict defendant of both taking and receiving the vehicle (*Ceja*, *supra*, 49 Cal.4th at p. 10; *Garza*, *supra*, 35 Cal.4th at p. 881), was error. Given that the prosecutor introduced evidence of the semi's value and that the jury found the value of the semi exceeded $950 in conjunction with receiving stolen property in count 13, the first error was unquestionably harmless beyond a reasonable doubt.[9] For the reasons set forth below, we also conclude the second error was harmless.

### 2. Error Harmless

### a. Standard of Review

"Dual convictions are permissible … if the [Vehicle Code] section 10851[, subdivision ](a) conviction is for posttheft driving of the vehicle." (*Garza*, *supra*, 35 Cal.4th at p. 881.) Courts begin with the presumption that the defendant's dual convictions for unlawfully taking or driving a vehicle and for receiving the vehicle are valid, and the defendant bears the burden of affirmatively showing prejudicial error amounting to a miscarriage of justice. (*Ibid.*) "[W]e ask whether it is reasonably

---

[9] "The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*); accord, *People v. Mil* (2012) 53 Cal.4th 400, 409.) When the trial court fails to instruct the jury on an element of the offense, the error is of federal constitutional magnitude "because it violates the defendant's due process and Sixth Amendment rights to have a jury adjudicate guilt beyond a reasonable doubt." (*People v. Banks* (2014) 59 Cal.4th 1113, 1153, abrogated on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; accord, *Merritt*, *supra*, at p. 824; see *Alleyne v. United States* (2013) 570 U.S. 99, 103 (plurality opinion) ["Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."].) "[T]he more elements that are omitted, the less likely it is that the error is harmless, but so long as the error does not vitiate *all* of the jury's findings, it is amenable to harmless error analysis." (*Merritt*, *supra*, at p. 829; accord, *People v. Mil*, *supra*, at pp. 413–414.) Under the test set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), "[s]uch error is 'harmless only if, after conducting a thorough review of the record, the court determines beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" (*People v. Banks*, *supra*, at p. 1153; accord, *Merritt*, *supra*, at p. 831.)

11.

probable that a properly instructed jury would have reached a result more favorable to [the] defendant by not convicting him of violating both [Vehicle Code] section 10851[, subdivision ](a) and section 496[d]." (*Id.* at p. 882, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Under *Watson*, the harmless error test "'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

### b. Evidence of Posttheft Driving Overwhelming

In evaluating the propriety of dual convictions, the relevant inquiry "is whether the driving was part of the theft, or an independent crime. If the evidence showed only one continuous violation of [Vehicle Code] section 10851, in which the driving was part and parcel of the taking, then a conviction for driving *or* taking under [Vehicle Code] section 10851 is a conviction for 'theft of the same property' which bars conviction under [Penal Code] section 496[d]. If, however, the evidence showed two distinct violations of [Vehicle Code] section 10851—one taking, and one separately chargeable driving—then a conviction based on the unlawful driving is not a conviction for 'theft of the same property' and does not bar a conviction for receiving the same vehicle …." (*People v. Strong* (1994) 30 Cal.App.4th 366, 374 (*Strong*); accord, *Garza*, *supra*, 35 Cal.4th at pp. 880–881; *Calistro*, *supra*, 12 Cal.App.5th at pp. 403–404; *People v. Cratty* (1999) 77 Cal.App.4th 98, 102–103 (*Cratty*).)

Over the years, courts have articulated different guidelines for determining what constitutes "a 'substantial break' between the taking and the driving [sufficient to] give rise to a conviction under Vehicle Code section 10851 distinct from any liability for vehicle theft." (*Page*, *supra*, 3 Cal.5th at pp. 1188–1189, quoting *People v. Kehoe*,

*supra*, 33 Cal.2d at p. 715.)  As this court summarized in *Calistro*, "The theft of the vehicle may be considered complete when the driving is not 'part of the original taking' ([*Strong*, *supra*,] 30 Cal.App.4th [at pp.] 375–376] ); when the driving is 'an act distinct from the taking' ([*Cratty*, *supra*,] 77 Cal.App.4th [at p.] 103] ); when the driving is 'for purposes unconnected with the original taking' (*People v. Malamut* (1971) 16 Cal.App.3d 237, 242); 'when the driving is no longer part of a "'continuous journey away from the locus of the theft'"' (*Garza*, [*supra*, 35 Cal.4th] at p. 880); or when the driving is not part of the escape from the scene of the theft (see *People v. Carroll* (1970) 1 Cal.3d 581, 585).  'One might also suggest that the taking is complete when the taker reaches a place of temporary safety.  [Citation.]  Whatever the precise demarcation point may be …, once a person who has stolen a car has passed that point, further driving of the vehicle is a separate violation of [Vehicle Code] section 10851[, subdivision](a) that is properly regarded as a nontheft offense.…' (*Garza*, at pp. 880–881.)" (*Calistro*, *supra*, 12 Cal.App.5th at p. 395.)

 *Calistro* is instructive.  In that case, the victim's car was stolen from outside his apartment.  (*Calistro*, *supra*, 12 Cal.App.5th at p. 391.)  Five hours later and fewer than five miles away, an officer located the car parked near a gas pump at a 7-Eleven store.  (*Id.* at p. 392.)  The defendant was sitting in the driver's seat and there was a shaved car key in the ignition.  (*Ibid.*)  We concluded "little evidence supported the inference that defendant *took* the car, even though the jurors may have believed that he did.  But evidence that he *drove* the car was overwhelming." (*Id.* at p. 402.)  Further, "the evidence overwhelmingly supported the conclusion that even if [the] defendant was in fact the car thief, his driving of the car was an act separate and distinct from its taking.  He had long since left the *locus* of the theft, was no longer in the process of escape, and now felt sufficiently removed from the crime that he could stop for gas and linger in the stolen car at the 7-Eleven.  Nothing suggested he was still in the process of taking the car or fleeing the scene of the crime." (*Id.* at p. 403.)

13.

"In light of this overwhelming evidence of [the] defendant's posttheft *driving*, even if every juror believed that [the] defendant both took the car *and* drove it after the theft was complete, no reasonable juror could have found that he took the car *but did not drive it* after the theft was complete. [Citation.] Thus, the jury necessarily found that [the] defendant drove the car in an act that was distinct from and independent of the taking of the car. This act constituted a separate offense for which [the] defendant could be separately convicted." (*Calistro*, *supra*, 12 Cal.App.5th at p. 403.)

In this case, defendant was charged with taking or driving the semi, the jury was instructed on taking or driving the semi, and the prosecutor theorized that defendant both took and drove the semi. There was no direct evidence that defendant took the semi, although the proximity of the tire wholesaler to the repair lot where the semi was stolen and defendant's possession of the specialized knowledge needed to drive a semi was persuasive circumstantial evidence of the theft. In contrast, there was overwhelming direct evidence that defendant drove the semi: the crime was recorded by a surveillance camera and witnessed by an employee of the tire wholesaler and multiple law enforcement officers. Defendant drove the semi to the yard next to the tire wholesaler, exited the semi, detached the trailer, lined up another trailer, reentered the semi, smashed through the fence into the tire wholesaler's yard, exited the semi again, began stealing tires, and then reentered the semi and fled in it once police arrived.

Under these circumstances, we cannot agree with defendant's view that the theft of the semi and the driving were a continuous transaction without any separation. At the time of the events at the tire wholesaler's lot and the subsequent flight, defendant was neither still in the process of taking the semi nor fleeing the locus of the theft. (*Calistro*,

14.

*supra*, 12 Cal.App.5th at pp. 394–395.) To the contrary, as in *Calistro*, the evidence demonstrated a completed theft and posttheft driving.[10]

Nor did the prosecutor elect a taking theory over a driving theory.[11] Although defendant claims a taking theory and the People claim a driving theory, the record reflects that the trial court and the parties were not particularly focused on the need to distinguish between the taking and driving theories. The main issue at trial was the

---

[10] As defendant's argument that he engaged in a continuous course of conduct contemplates, numerous cases involve a break of days, months or years between the theft and the driving. (E.g., *Garza*, *supra*, 35 Cal.4th at p. 872 [six days between theft and recovery of vehicle]; *Cratty*, *supra*, 77 Cal.App.4th at pp. 99–100 [eight months between theft and recovery of vehicle]; *Strong*, *supra*, 30 Cal.App.4th at p. 375 [four days between theft and recovery of vehicle]; *People v. Malamut*, *supra*, 16 Cal.App.3d at pp. 241–242 [two months between theft and recovery of vehicle]; *People v. Cuevas* (1936) 18 Cal.App.2d 151, 152 [four years between theft and recovery of vehicle].) However, *Calistro* involves a temporal break of only five hours, approximately (*Calistro*, *supra*, 12 Cal.App.5th at p. 392), and, critically, the standards articulated by courts in determining when a theft is completed do not demand a temporal break of specific measure (see *Garza*, *supra*, at pp. 880–881).

[11] "In a criminal case, a jury verdict must be unanimous[,]" and a prosecutor's failure to clearly elect a theory is problematic in cases where the trial court should have but did not give a unanimity instruction. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 877–878; *People v. Brown* (2017) 11 Cal.App.5th 332, 341.) In this case, neither party addresses the absence of a unanimity instruction for count 12 as requested by the prosecutor, and the trial court may have taken the view that the taking and driving were a continuous course of conduct that did not require a unanimity instruction. (*People v. Williams* (2013) 56 Cal.4th 630, 682 ["[A] '"unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction."'"].) Where a unanimity instruction is required, there is a split of authority among the Courts of Appeal regarding whether the state or federal standard of review applies. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 576–577 [applying federal Constitution standard under *Chapman*]; *People v. Vargas* (2001) 91 Cal.App.4th 506, 562 [concluding state constitutional standard *Watson* applies because "there [is] no right to a unanimous verdict under the United States Constitution"].) In light of the United States Supreme Court's determination that "[t]here can be no question … that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally" (*Ramos v. Louisiana* (2020) ___ U.S. ___, ___ [140 S.Ct. 1390, 1397]), we assume the federal standard of review applies, but, for the reasons discussed, the strong evidence of posttheft driving renders any error was harmless beyond a reasonable doubt under the circumstances here (*Merritt*, *supra*, 2 Cal.5th at p. 831, citing *Neder v. United States* (1999) 527 U.S. 1, 18 [error of federal constitutional magnitude harmless if the court concludes "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error"]).

15.

identity of the semi driver since the crimes occurred in the dark of night, the events at the tire wholesaler's yard transpired rapidly, and the driver managed to escape the semi without being seen after crashing into the cinderblock wall. During closing argument, the prosecutor moved quickly through the elements of Vehicle Code section 10851, subdivision (a), and described the offense in part as a "taking" while pointing out, "We see it. [Defendant] drove that semi truck." Defense counsel did not address the elements of the crimes and instead focused on creating doubt regarding the issue of identity.

Given the absence of any direct evidence that defendant took the semi but the overwhelming evidence of posttheft driving, we conclude that no reasonable juror could have concluded that defendant took the semi but did not drive it. Where "it is not reasonably probable that a properly instructed jury would have found [the] defendant guilty of violating [Vehicle Code] section 10851[, subdivision ](a) by stealing the [vehicle] but not by posttheft driving[,]" it is permissible to "uphold both convictions by construing [the] defendant's conviction under [Vehicle Code] section 10851[, subdivision ](a) as a nontheft conviction for posttheft driving." (*Garza*, *supra*, 35 Cal.4th at p. 882, fn. omitted; accord, *Calistro*, *supra*, 12 Cal.App.5th at p. 404; *Cratty*, *supra*, 77 Cal.App.4th at p. 103.) Accordingly, on these facts, defendant's conviction may be properly construed as one for posttheft driving and we reject his claim that he was convicted of both taking and receiving the same property.

## II.      Failure to Stay Vandalism Sentence on Count 10[*]

### A.      Summary of Parties' Positions

Defendant was convicted on count 7 of reckless evasion of a peace officer, on count 8 of reckless evasion of a peace officer while driving against traffic, and on count 10 of vandalizing the semi during his collision with the cinderblock wall. The traffic violations underlying count 7 included the failure to stop at red lights and stop

---

[*]      See footnote, *ante*, page 1.

signs, excessive speed, and the collisions with a parked car and the cinderblock wall. Defendant's act of driving against traffic underlying count 8 occurred during a specific portion of the vehicle pursuit, between the other traffic violations mentioned and the collision that ended the pursuit.

The trial court stayed the sentence on count 7 under section 654. Defense counsel argued unsuccessfully that the court should also stay the sentence for vandalism on count 10 because the damage to the semi occurred during the vehicle evasion charged in count 8. Defendant pursues this argument on appeal, claiming that since he was sentenced on count 8 for reckless evasion of a peace officer while driving against traffic, under either the single physical act test or the indivisible course of conduct test, section 654 applies to his sentence on count 10 for damaging the semi in the collision.[12]

The People contend that counts 8 and 10 arise from a divisible course of conduct and, alternatively, the trial court could have reasonably concluded that the crimes were committed with multiple objectives. We agree with the People that on the facts of this case, the crimes of driving against traffic and vandalism occurred during a divisible course of conduct and we affirm the sentence on that basis.[13]

---

[12]    In his reply brief, defendant clarifies that his reference in the opening brief to count 3, damage to the tire wholesaler's fence, was a drafting error and his claim under section 654 is limited to count 10.

[13]    We reject defendant's conclusory assertion that Vehicle Code section 2800.4 (count 10) is merely a penalty provision rather than a separate crime. A substantive offense defines or sets forth elements of a crime, a sentence enhancement "add[s] 'an additional term of imprisonment to the base term[,]'" and "'[a] penalty provision prescribes an added penalty to be imposed when the offense is committed under specified circumstances[]'" and "'is separate from the underlying offense ….'" (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 898, 899.) Vehicle Code section 2800.4 sets forth the elements of the crime of willful driving of a vehicle in the direction opposite lawful traffic and the punishment for that crime (*People v. Canela* (2014) 224 Cal.App.4th 703, 709), just as Vehicle Code section 2800.2 proscribes the crime of reckless evasion and provides the penalty (*People v. Byrd* (2016) 1 Cal.App.5th 1219, 1222–1223). That the statutory elements *include* fleeing or attempting to elude a peace officer in violation of Vehicle Code section 2800.1 does not transform Vehicle Code section 2800.4—or Vehicle Code

17.

### B. Legal Standard

Section 654 provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.…" (*Id.*, subd. (a).) The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry .…" (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single '"intent and objective"' or multiple intents and objectives." (*Ibid.*)

We review the trial court's express or implied factual findings for substantial evidence, and its conclusions of law de novo. (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5; *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) We "affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground[]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, fn. 14, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104; accord, *People v. Brents*, *supra*, at p. 618), and where, as here, there is no "explicit ruling by the trial court at sentencing, we infer that the court made the finding

---

section 2800.2—into a penalty provision and defendant offers no persuasive analysis to the contrary.

18.

appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it[]" (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1045, citing *People v. Tarris* (2009) 180 Cal.App.4th 612, 626–627).

### C.    Analysis

#### 1.    Single Physical Act

"Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*People v. Corpening*, *supra*, 2 Cal.5th at p. 313.) The relevant inquiry is whether "'a separate and distinct act can be established as the basis of each conviction .…'" (*People v. Beamon* (1973) 8 Cal.3d 625, 637; accord, *People v. Corpening*, *supra*, at p. 316.)

Count 8 was based on defendant's act of driving against traffic for approximately one-half mile while traveling northbound on Martin Luther King Boulevard between Brundage and Virginia. The damage to the semi in count 10 occurred when defendant lost control and collided with a cinderblock wall while turning from northbound Washington onto eastbound Potomac. As the act underlying count 8 was tied to a specific portion of the pursuit and the collision damage occurred separately both temporally and geographically from the act of driving against traffic, we reject defendant's argument that the two counts were founded on a single physical act.

#### 2.    Indivisible Course of Conduct

Generally, "'"[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."'" (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 885, quoting *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) However, "'[t]he temporal proximity of the two offenses is

19.

insufficient by itself to establish that they were incident to a single objective[]'" (*People v. Jackson* (2016) 1 Cal.5th 269, 354, quoting *People v. Capistrano*, *supra*, at p. 887; accord, *Harrison*, *supra*, 48 Cal.3d at p. 335), and "'[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance[]'" (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514, quoting *People v. Beamon*, *supra*, 8 Cal.3d at p. 636; accord, *Harrison*, *supra*, at p. 336). Section 654 "is intended to ensure that [the] defendant is punished 'commensurate with his culpability'" (*Harrison*, *supra*, at p. 335), and the California Supreme Court has cautioned that "a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger the statute would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment[]'" (*id.* at pp. 335–336, quoting *People v. Perez*, *supra*, 23 Cal.3d at pp. 552–553).

"'If [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People v. Porter* (1987) 194 Cal.App.3d 34, 38, quoting *People v. Beamon*, *supra*, 8 Cal.3d at p. 639; accord, *Harrison*, *supra*, 48 Cal.3d at p. 335; *People v. Tom* (2018) 22 Cal.App.5th 250, 260.) This determination requires consideration of "all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*People v. Porter*, *supra*, at p. 38, citing *People v. Goodall* (1982) 131 Cal.App.3d 129, 148; accord, *People v. Tom*, *supra*, at p. 260.)

"Furthermore, 'multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm.'" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717, quoting *People v. Felix* (2001) 92

20.

Cal.App.4th 905, 915.) "Under section 654, a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.'" (*People v. Lopez*, *supra*, at pp. 717–718, quoting *People v. Gaio* (2000) 81 Cal.App.4th 919, 935; accord, *People v. Roles* (2020) 44 Cal.App.5th 935, 946; *People v. Gaynor* (2019) 42 Cal.App.5th 794, 803–804.)

In this case, although defendant drove against traffic on a half-mile stretch of Martin Luther King Boulevard and later collided with the wall at Washington and Potomac during the same vehicle pursuit, the two events were distinct crimes "necessarily accomplished through separate actions.'" (*People v. Jackson*, *supra*, 1 Cal.5th at p. 354.) Neither crime was merely incidental to the other or committed as a means of committing the other (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 53; *People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1006; *People v. Bui* (2011) 192 Cal.App.4th 1002, 1015), and between the two acts, defendant made a number of turns onto different streets, swerved toward Officer Otterness's patrol vehicle as it protected an alleyway, and hit a parked car. Under these circumstances, we conclude that the course of conduct at issue here was divisible in time, affording defendant time to reflect on his actions between the point he drove in the wrong lane against traffic and the later point he lost control while making a turn and hit the wall. (*People v. Gaynor*, *supra*, 42 Cal.App.5th at p. 803; *People v. Lopez*, *supra*, 198 Cal.App.4th at p. 718.) This conclusion comports with the goal of ensuring punishment commensurate with culpability, as the acts occurred at separate times over the course of a dangerous, high-speed chase that lasted approximately 10 minutes and covered four miles. (*Harrison*, *supra*, 48 Cal.3d at p. 335.) Accordingly, the trial court's failure to stay the sentence on count 10 did not constitute error, which also forecloses defendant's claim that the asserted error violated

21.

his right to due process.  (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 426, fn. 6; *People v. Tom*, *supra*, 22 Cal.App.5th at p. 261.)

**III.     *Dueñas* Claim**

**A.     Background**

Finally, as previously set forth, the trial court imposed a restitution fine of $300 under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $300 under section 1202.45, subdivision (a), stayed; a crime prevention fine of $10 under section 1202.5; a total court operations assessment of $520 under section 1465.8; and a total court facilities assessment of $390 under Government Code section 70373.[14] Relying on the Court of Appeal's decision in *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant claims that the imposition of fines and court assessments without a determination that he has the ability to pay violates his right to due process and equal protection.  He requests that the fines and assessments be vacated or stricken, or that the matter be remanded for an ability-to-pay hearing.

The People contend that defendant forfeited his constitutional challenge based on his failure to object in the trial court.  On the merits, they contend that his challenge to the restitution fine should be limited to and found constitutional under the federal and state excessive fines clauses.  They further contend that *Dueñas* wrongly decided imposition of the restitution fine implicates a fundamental liberty interest and absent a fundamental liberty interest, the statute survives rational basis review.  Finally, they concede that the court operations and court facilities assessments should not be imposed on those unable to pay.

In reply, defendant disputes that the excessive fines clause bars his claim.

---

**14**     The abstract of judgment incorrectly reflects that the trial court imposed a total court operations assessment of $480 and a total court facilities assessment of $360.  We may, on our own motion, order the correction of these clerical errors.  (*People v. Leon*, *supra*, 8 Cal.5th at p. 855; *People v. Mitchell*, *supra*, 26 Cal.4th at p. 185.)

For reasons we shall discuss, we reject the People's forfeiture argument and in light of the undeveloped record on these issues, we conclude it is appropriate to remand the matter to the trial court for the limited purpose of allowing defendant to raise the issue of his ability to pay the fines and court assessments, and to make a record on those issues.

## B. Splits of Authority

Presently, Courts of Appeal are split regarding if, and under what circumstances, the forfeiture doctrine applies to a claim brought pursuant to the decision in *Dueñas*. Some courts have applied the forfeiture doctrine to the restitution fine, fees and assessments where, due to imposition of a restitution fine in an amount above the statutory minimum, the defendant had a right to object under the statute based on ability to pay but failed to do so. (*People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1033–1035 (*Montelongo*); *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032–1033 (*Gutierrez*); *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 463–464 (*Bipialaka*); *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154 (*Frandsen*).) Other courts have applied the forfeiture doctrine in this situation only to the restitution fine, reasoning that an objection to assessments and fees was foreclosed under the law prior to *Dueñas* and the failure to exercise the statutory right to object to the restitution fine may have been unrelated to ability to pay. (*People v. Taylor* (2019) 43 Cal.App.5th 390, 400–401; accord, *People v. Oliver* (2020) 54 Cal.App.5th 1084, 1100–1101.) Courts have generally declined to apply the forfeiture doctrine where the minimum restitution fine was imposed because the statute expressly precludes objection in that circumstance. (*People v. Son* (2020) 49 Cal.App.5th 565, 596–597 (*Son*); *People v. Jones* (2019) 36 Cal.App.5th 1028, 1031) (*Jones*).) However, in *People v. Rodriguez*, the Court of Appeal applied the forfeiture doctrine where the minimum restitution fine was imposed, but without discussion. (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 197, 206.)

Courts of Appeal are also split regarding if and under what circumstances the constitutional concerns underpinning the decision in *Dueñas* apply. The various paths

chosen have been summarized in other opinions, including *People v. Cowan* (2020) 47 Cal.App.5th 32, 39–42, review granted June 17, 2020, S261952 (*Cowan*).  It is sufficient to note that the decision in *Dueñas* was extended beyond the facts unique to Velia Dueñas's circumstances in *People v. Castellano* (2019) 33 Cal.App.5th 485, 489–491 (*Castellano*), and some Courts of Appeal followed *Dueñas*'s lead.  (E.g., *People v. Belloso* (2019) 42 Cal.App.5th 647, 662–663, review granted Mar. 11, 2020, S259755 (*Belloso*).)  Other courts have either decried *Dueñas* as wrongly decided, in part or in whole, or limited *Dueñas* to its facts.  (E.g., *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 859–861; *People v. Cota* (2020) 45 Cal.App.5th 786, 794–795; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1055 (*Lowery*); *People v. Allen* (2019) 41 Cal.App.5th 312, 326–330; *People v. Hicks* (2019) 40 Cal.App.5th 320, 325–330, review granted Nov. 26, 2019, S258946 (*Hicks*); *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067–1069 (*Aviles*); *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844 (*Kopp*).)

Opinions from our own court reflect some of the divergent views that followed the decision in *Dueñas*.  In *Aviles*, authored by our dissenting colleague, a panel of this court rejected *Dueñas*'s due process and equal protection analysis, and, building on Justice Benke's concurrence in *Gutierrez*, *supra*, 35 Cal.App.5th at pages 1038–1041, concluded that an objection to fines, fees and assessments based on ability to pay must be raised under the excessive fines clause of the Eighth Amendment, under which ability to pay is a factor.  (*Aviles*, *supra*, 39 Cal.App.5th at pp. 1067–1071.)  In *Lowery*, another panel of this court distinguished *Dueñas* on its facts; found no due process, equal protection, or excessive fines violation; and concluded any constitutional error was harmless.  (*Lowery*, *supra*, 43 Cal.App.5th at pp. 1054–1061.)

More recently, the majority in *Son* concluded that remand to allow the parties to make a record on the defendant's ability to pay was appropriate, but the panel was otherwise divided.  (*Son*, *supra*, 49 Cal.App.5th at p. 598.)  Justice Smith declined the

People's invitation to limit challenges to fines and fees to the Eighth Amendment's excessive fines clause (*id.* at p. 596, fn. 20), but concluded that a restitution fine, as punishment, survives rational basis review and may be imposed on an indigent litigant without regard to ability to pay (*id.* at p. 595).[15] With respect to nonpunitive court facilities and court operations assessments, Justice Smith concluded that whether considered under the due process or equal protection clause, the imposition of the assessments on indigent defendants does not survive strict scrutiny and violates the Constitution. (*Id.* at pp. 589–590.) Justice Snauffer concurred in the disposition, but did not join in or express a view on whether restitution fines are always punitive and therefore not subject to an ability-to-pay challenge. (*Id.* at pp. 598–599 (conc. opn. of Snauffer, J.).) Justice Franson, who concurred in part and dissented in part, distinguished *Dueñas* on its facts but concluded that even if a constitutional error is presumed, remand is unnecessary because the error is harmless beyond a reasonable doubt. (*Id.* at p. 599 (conc. & dis. opn. of Franson, J.).)

The California Supreme Court is now poised to address issues raised by *Dueñas*, having granted review in *Kopp*. In *Kopp*, the Court of Appeal found that as to court assessments, the defendants were entitled to remand for an ability-to-pay hearing under *Dueñas*, but they bore the burden of demonstrating their inability to pay. (*Kopp*, *supra*, 38 Cal.App.5th at pp. 95–96, review granted.) With respect to fines, the *Kopp* court declined to follow *Dueñas*'s due process approach and concluded that a constitutional challenge to a punitive fine must be raised under the excessive fines clause of the Eighth Amendment of the federal Constitution and article I, section 17 of the California Constitution. (*Kopp*, *supra*, at pp. 96–98, review granted.) The California Supreme Court limited review in *Kopp* to whether courts must consider a defendant's ability to pay

---

[15] The Eighth Amendment argument was undeveloped in *Son* and, therefore, the majority left it for the parties to raise in the trial court in the first instance. (*Son*, *supra*, 49 Cal.5th at p. 596, fn. 20.)

in imposing fines, fees and assessments; and, if so, which party bears the burden of proof. The court deferred briefing in *Cowan*, *Belloso* and *Hicks*, cited above, pending its decision in *Kopp*.

### C.     Forfeiture

Turning to the issues presented here, the failure to object in the trial court generally forfeits a claim on appeal and this principle is applicable to constitutional claims.  (§ 1259; *People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.)  There are exceptions to this general rule, however, and courts of review have the discretion to consider an issue notwithstanding the failure to object.  (*People v. McCullough, supra*, at p. 593; *In re Sheena K., supra*, at pp. 887–888, fn.7.)  In this case, the parties disagree over whether defendant forfeited his *Dueñas* claim by failing to object to the restitution fine and court assessments imposed by the trial court on the constitutional grounds now raised on appeal.  In our view, resolution of this issue in defendant's favor informs the disposition in this case.

### 1.     Cases Applying Forfeiture Doctrine to Imposition of Restitution Fines Above Statutory Minimum

It was unnecessary for the court in *Dueñas* to address the issue of forfeiture because the trial court held an ability-to-pay hearing following Velia Dueñas's objection and request for a hearing, but post-*Dueñas*, several cases have applied the forfeiture doctrine where the trial court imposed a restitution fine above the statutory minimum. (*Gutierrez, supra*, 35 Cal.App.5th at pp. 1032–1033; *Bipialaka, supra*, 34 Cal.App.5th at p. 464; *Frandsen, supra*, 33 Cal.App.5th at pp. 1153–1154.)[16]

The restitution statute provides that the inability to pay is not a "compelling and extraordinary reason not to impose a restitution fine[]" (§ 1202.4, subd. (c)), but where,

---

[16]    As previously stated, the Court of Appeal in *People v. Rodriguez* applied the forfeiture doctrine to a minimum restitution fine, but did so without discussion. (*People v. Rodriguez, supra*, 40 Cal.App.5th at pp. 197, 206.)

as in *Gutierrez*, *Bipialaka* and *Frandsen*, a trial court imposes a restitution fine above the statutory minimum, the court may consider the defendant's inability to pay in setting the fine (§ 1202.4, subd. (d)). Because the defendants in such cases could have but did not object to the imposition of a restitution fine above the statutory minimum, the Courts of Appeal concluded they forfeited their claims. *Gutierrez* and *Frandsen*, and *Montelongo* more recently, also reasoned by extension that given the absence of any objection over the imposition of a restitution fine in the maximum amount of $10,000, there would have been no basis to object to the imposition of fees or assessments in a substantially lesser amount. (*Montelongo*, *supra*, 55 Cal.App.5th at pp. 1033–1035; *Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033; *Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) In this case, the trial court imposed the minimum restitution fine, which, under the plain language of the statute, was not objectionable based on inability to pay (§ 1202.4, subd. (c)), and, therefore, the reasoning of *Montelongo*, *Gutierrez* and *Frandsen* does not apply.[17]

### 2. Failure to Object Excused Where Futile or Unsupported Under Existing Law

"Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence." (*People v. Welch* (1993) 5 Cal.4th 228, 237; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 286–287; *People v. Black* (2007) 41 Cal.4th 799, 810.) Defendant argues that the futility exception to the forfeiture doctrine is applicable here. We agree.

---

[17] As the People point out, section 1202.5, under which the trial court imposed the $10 crime prevention fine, includes an ability-to-pay component. We agree with the proposition expressed by several Courts of Appeal that the failure to avail oneself of the statutory right to challenge a restitution fine exceeding the statutory minimum logically undermines a later challenge to much lower assessment amounts based on inability to pay. (*Montelongo*, *supra*, 55 Cal.App.5th at pp. 1033–1035; *Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033; *Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) However, the failure to object to a $10 fine is not similarly informative when assessing the failure to object to a restitution fine and court assessments in a much greater amount when neither the statutory terms nor the substantive law supported such an objection.

27.

In cases such as this, involving the imposition of the statutory minimum restitution fine and mandatory court assessments, the decision in *Dueñas* constituted a marked departure from existing law. As recognized by the Court of Appeal in *Castellano*, "[N]o California court prior to *Dueñas* had held it was unconstitutional to impose fines, fees or assessments without a determination of the defendant's ability to pay[; and] none of the statutes authorizing the imposition of the fines, fees or assessments at issue authorized the court's consideration of a defendant's ability to pay." (*Castellano*, *supra*, 33 Cal.App.5th at p. 489.) The Court of Appeal in *People v. Johnson* (2019) 35 Cal.App.5th 134, 138, agreed, explaining, "Granted, *Dueñas* is grounded in longstanding due process principles and precedent (see *Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168–1169, 1171 [relying on *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660]), but the statutes at issue here stood and were routinely applied for so many years without successful challenge (see *Dueñas*, *supra*, 30 Cal.App.5th at p. 1172, fn. 10), that we are hard pressed to say its holding was predictable and should have been anticipated." (Fn. omitted.)

Another Court of Appeal subsequently adopted this view, pointing out that in addition to the statutory language that "all but precluded" a meaningful opportunity to contest the restitution fine and "all but foreclosed" a due process challenge to the fee assessments (*Jones*, *supra*, 36 Cal.App.5th at p. 1032), "controlling case law on point effectively foreclosed any objection that imposing the $300 restitution fine without conducting an ability to pay hearing violated his due process rights[]" (*id.* at p. 1031, citing *People v. Long* (1985) 164 Cal.App.3d 820, 826, 828 (*Long*)). Indeed, in *Long*, this court rejected a due process challenge based on the defendant's inability to pay, stating, "[C]onsideration of a defendant's inability to pay a [restitution] fine is clearly not

28.

a prerequisite to the imposition of the fine." (*Ibid.*)**18**  The *Long* court concluded that imposition of the restitution fine was not constitutionally infirm because the defendant would "suffer no further incarceration based on [his] inability to pay[,]" the only detriment being "possible execution against whatever nonexempt assets he may have to satisfy his delinquent indebtedness to the state." (*Long, supra*, at p. 828.)  The decision in *Long* was thereafter followed in rejecting similar challenges based on inability to pay. (*People v. Sandoval* (1989) 206 Cal.App.3d 1544, 1549, 1550 [applying reasoning in *Long* to reject ability-to-pay challenge to direct victim restitution order, but concluding the defendant was deprived of a reasonable opportunity to be heard on the restitution issue, where the trial court "unexpected[ly]" imposed restitution in an amount and under terms that differed from that recommended in the probation report]; *People v. McGhee* (1988) 197 Cal.App.3d 710, 715 [rejecting excessiveness challenge to $10,000 restitution fine and stating alleged lack of assets and limited employment not relevant].)

The *Jones* court found that "it was reasonable for [the defendant] to conclude at the time of his sentencing that he could not meaningfully raise the objection that ultimately prevailed in *Dueñas*.  As our Supreme Court has explained, '[t]he circumstance that some attorneys may have had the foresight to raise this issue does not mean that competent and knowledgeable counsel reasonably could have been expected to anticipate[]' the change in law." (*Jones, supra*, 36 Cal.App.5th at p. 1034, quoting *People v. Black, supra*, 41 Cal.4th at p. 812; accord, *People v. Perez* (2020) 9 Cal.5th 1, 8; *Son, supra*, 49 Cal.App.5th at pp. 596–597.)  *Jones* rejected the *Frandsen* court's

---

**18**     In *Dueñas*, the court stated, "To the extent that … *Long*[, *supra*,] 164 Cal.App.3d 820 remains viable despite its reliance on multiple statutes that have since been amended, we respectfully disagree with its due process analysis." (*Dueñas, supra*, 30 Cal.App.5th at p. 1172, fn. 10.)  In *Jones*, however, the court observed, "At bottom, *Dueñas* simply disagreed with *Long*'s due process analysis. [Citation.]  While *Dueñas* noted that *Long* interpreted statutes that were subsequently amended [citation], we do not see the fact of amendments as having been decisive in *Dueñas*, nor changes that foretold that decision.  The amendments did not change the relevant bases for the fines." (*Jones, supra*, 36 Cal.App.5th at pp. 1031–1032.)

29.

assertion that "*Dueñas* was foreseeable [because] Dueñas herself foresaw it[]" and it applied old law (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154), stating, "[W]e will not characterize *Dueñas* as foreseeable simply because it cited principles stretching back to the Magna Carta[]" (*Jones*, *supra*, at p. 1034). "[T]he fact that a new case relies on long-held principles or other established law does not necessarily mean it was foreseeable." (*Ibid.*, citing *People v. Black*, *supra*, at pp. 810–812; accord, *People v. Perez*, *supra*, at pp. 9–10; *Son*, *supra*, at pp. 597–598.)

Given the statutory language of section 1202.4 and the state of the substantive law prior to *Dueñas*, we conclude that defendant did not forfeit his *Dueñas* claim by failing to object to the minimum restitution fine and court assessments in the trial court.

## D.      Remand Appropriate Due to Undeveloped Record

As the parties did not have the benefit of *Dueñas* at the time of sentencing and defendant did not forfeit his claim, we believe it is appropriate to allow defendant to raise the issue in the trial court on remand, where he will bear the burden of both demonstrating a harm of constitutional magnitude and making a record regarding his alleged inability to pay the restitution fine and court assessments. In the absence of a developed record on these issues, we express no view as to whether defendant may be able to state a viable claim that ultimately withstands constitutional scrutiny on review.

The *Dueñas* case included a detailed record regarding the legal proceedings that began when the defendant was a teenager and culminated in the situation confronted by the Court of Appeal. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1163.) That record included the defendant's dire financial circumstances: she and her husband were homeless and had two children they were unable to support fully on the government assistance received, her husband was unemployed other than occasional short-term construction work, and she had dropped out of high school and was unemployed as a result of a disability. (*Id.* at pp. 1160–1161.)

Thus, while *Dueñas* referred to a defendant's "*present* ability to pay," because the trial court already determined that the defendant was unable to pay, the "present ability" language in *Dueñas* should not be divorced from the facts. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164, italics added.) *Dueñas* is also distinguishable on the issue of burden.

These points were subsequently clarified in *Castellano*, which explained, "Our holding … that the fees and assessments could not constitutionally be assessed and that execution of the restitution fine had to be stayed was based on the trial court's uncontested finding that Dueñas was unable to pay the amounts imposed." (*Castellano*, *supra*, 33 Cal.App.5th at p. 490.) "Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court. In doing so, the defendant need not present evidence of potential adverse consequences beyond the fee or assessment itself, as the imposition of a fine on a defendant unable to pay it is sufficient detriment to trigger due process protections. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168–1169.) The trial court then must consider all relevant factors in determining whether the defendant is able to pay the fines, fees and assessments to be imposed. Those factors may include, but are not limited to, potential prison pay during the period of incarceration to be served by the defendant. If the trial court determines a defendant is unable to pay, the fees and assessments cannot be imposed; and execution of any restitution fine imposed must be stayed until such time as the People can show that the defendant's ability to pay has been restored. (*Dueñas*, at pp. 1168–1169, 1172.)" (*Ibid.*, fn. omitted; accord, *Belloso*, *supra*, 42 Cal.App.5th at pp. 662–663, review granted.)

Other courts, following *Castellano*, have concluded "that the evaluation of ability to pay must include future ability to pay," and "defendant bears the burden of proof on that issue." (*Cowan*, *supra*, 47 Cal.App.5th at p. 49, review granted; accord, *People v.*

31.

*Santos* (2019) 38 Cal.App.5th 923, 934; *Kopp*, *supra*, 38 Cal.App.5th at p. 96, review granted.)

Where, as in this case, a defendant advances a claim premised on a significant and unforeseeable development in the law that occurred after sentencing and during the pendency of the appeal; there was no statutory right to object to the restitution fine and court assessments at issue; and the record is wholly undeveloped on the issue, a limited remand is appropriate to allow the parties to address the issue in the trial court in the first instance. However, the United States Supreme Court has recognized that "[t]he State … has a fundamental interest in appropriately punishing persons—rich and poor—who violate its criminal laws. A defendant's poverty in no way *immunizes* him from punishment." (*Bearden v. Georgia*, *supra*, 461 U.S. at p. 669, italics added; see *People v. Lewis* (2009) 46 Cal.4th 1255, 1321 ["[The] defendant's assertion that he was unable to pay the fine did not compel the court to impose a lesser fine."].) Discretion to determine an appropriate fine amount rests with the trial court and the court is free to consider, among other factors, any money received by a defendant, be it in the form of prison wages or gifts. (*People v. Potts* (2019) 6 Cal.5th 1012, 1055–1056 [concluding trial court could lawfully impose $10,000 restitution fine despite condemned inmate's categorical ineligibility to earn prison wages and his receipt of only occasional small gifts of money from family, and rejecting argument "that a fine is automatically invalid if a defendant is unable to pay it"].)

### E.     Harmlessness of Error

Finally, the People point out that defendant reported earning $2,000 a month with $900 a month in expenses at the time of arrest, and given his young age and employment as a laborer, it may be presumed that he is able-bodied and capable of earning wages.[19] Although defendant arguably has age and prior employment in his favor, circumstances

---

[19]     Defendant was 20 years old at the time of the crimes.

32.

change, and the trial court is in the best position to assess the factors relevant in each case. The People offer no persuasive basis for a finding that defendant's pre-arrest earnings necessarily speak to his present or future ability to pay fines and assessments imposed postconviction.

While there is authority supporting the proposition that prisoners are able to pay fines, fees and assessments out of future prison wages (*People v. Santos*, *supra*, 38 Cal.App.5th at p. 934; *Kopp*, *supra*, 38 Cal.App.5th at p. 96, review granted; *Jones*, *supra*, 36 Cal.App.5th at p. 1035; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397; *People v. Gentry* (1994) 28 Cal.App.4th 1374, 1376–1377; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487), or small gifts from friends or family (*People v. Potts*, *supra*, 6 Cal.5th at pp. 1055–1056), because the record is undeveloped, reliance on either proposition is purely speculative at this juncture (*Son*, *supra*, 49 Cal.App.5th at p. 591; see *Cowan*, *supra*, 47 Cal.App.5th at p. 49, review granted ["evaluation of ability to pay must include future ability to pay"]). Not all inmates are able to work, due to their own limitations or to prison restrictions, and "not all inmates [who work] are eligible for paid positions, which are considered a privilege and are subject to various restrictions and requirements." (*Son*, *supra*, at p. 591, citing Cal. Code Regs., tit. 15, §§ 3040, 3041.1.) Furthermore, not all inmates receive monetary gifts from friends or family.[20] In view of the aforementioned considerations, the present record does not allow for any meaningful review of defendant's ability to pay, and given that defendant did not forfeit his claim, the most appropriate course of action is to allow the parties and the trial court to make a record on these issues.

In closing, the Court of Appeal in *Hicks* recognized that "the fundamental policy question presented in *Dueñas* is a nettlesome one—namely, under what circumstance is it

---

[20] The record in *People v. Potts* included evidence that the defendant periodically received small monetary gifts. (*People v. Potts*, *supra*, 6 Cal.5th at pp. 1055–1056.)

appropriate to require criminal defendants, many of whom are people of little or no means, to pay assessments that help defray the costs of operating the court system and restitution fines that pour into a statewide fund that helps crime victims?" (*Hicks*, *supra*, 40 Cal.App.5th at p. 328, review granted.)  Although we believe it is premature to weigh in on the issues given that defendant did not forfeit his claim and the record is undeveloped, the sentiment expressed in *Hicks* bears repeating.

Criminal defendants face varying circumstances.  Some are serving terms of life in prison or terms tantamount to life in prison, while others are certain to be released back into society sooner or later.  Of those released, some will find gainful employment, but many will not.  In attempting to balance an individual defendant's future ability to pay, much will remain unknown and, as stated, circumstances may change, *either favorably or unfavorably*.  A process that assesses future ability to pay at a fixed point during sentencing raises difficult questions because in most cases, the harm at issue in *Dueñas*—that is, "the cascading consequences of imposing fines and assessments that a defendant cannot pay"—will be realized much further downstream, if at all.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1163; see *Mathews v. Eldridge* (1976) 424 U.S. 319, 333 ["The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"]; *People v. Ayala* (2000) 23 Cal.4th 225, 253 ["'"'Due process is flexible and calls for such procedural protections as the particular situation demands.'"'"].)  We note that the Legislature recently made some changes to the law with respect to court-imposed criminal fees, although not to the statutes at issue here as of yet, and, at a minimum, allowing some flexibility for changed circumstances further downstream may merit consideration.  (Assem. Bill No. 1869 (2019-2020 Reg. Sess.) ch. 92.)

## DISPOSITION

This matter is remanded to the trial court to allow defendant the opportunity to raise the issue of his ability to pay the fines and assessments imposed.  The judgment is

otherwise affirmed. If there is no change to the judgment on remand regarding the court assessments, the trial court shall correct the abstract of judgment to reflect a total court operations assessment under Penal Code section 1465.8 of $520 and a total court facilities assessment under Government Code section 70373 of $390, and shall forward the amended abstract of judgment to the appropriate authorities.


MEEHAN, J.

I CONCUR:



DeSANTOS, J.

35.

POOCHIGIAN, Acting P.J., Concurring and Dissenting.

I concur with the majority opinion and the direction to correct the errors in the abstract of judgment, but respectfully dissent from the decision to remand the matter for defendant to challenge the imposition of the restitution fine and other fees and assessments.

As explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), I believe *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. Under that standard, the fines and fees imposed in this case are not grossly disproportionate to defendant's level of culpability and the harm he inflicted, and thus not excessive under the Eighth Amendment. (*Id*. at pp. 1068–1072.)

To the extent it is argued *Dueñas* applies to this case, the court imposed the minimum restitution fine of $300, and I agree that defendant lacked the statutory authority to object to that order under the governing law at the time of his sentencing hearing. (Cf. *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154.) However, defendant had the statutory ability to raise an ability to pay objection to the court's imposition of the crime prevention fine pursuant to section 1202.5, subdivision (a). (See, e.g., *People v. McCullough* (2013) 56 Cal.4th 589, 590, 598–599.) Defendant could have raised his ability to pay objection under section 1202.5, presented evidence about his financial situation, and argued he similarly lacked the ability to pay the other amounts ordered. (See, e.g., *People v. Frandsen, supra*, 33 Cal.App.5th at pp. 1153–1154.)

Even if I agreed with *Dueñas*, I would not remand the matter, and would instead reject defendant's constitutional claims and find any error arising from the court's failure to make an ability to pay finding was harmless beyond a reasonable doubt, since defendant has the ability to pay the fines and fees imposed in this case. (*Chapman v.*

*California* (1967) 386 U.S. 18, 24; *Aviles, supra*, 39 Cal.App.5th at pp. 1075–1077;

*People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031.)

> " ' "Ability to pay does not necessarily require existing employment
> or cash on hand." [Citation.] "[I]n determining whether a defendant has
> the ability to pay a restitution fine, the court is not limited to considering a
> defendant's *present* ability but may consider a defendant's ability to pay in
> the future." [Citation.] This include[s] the defendant's ability to obtain
> prison wages and to earn money after his release from custody. [Citation.]'
> [Citations.]" (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076.)

It can be inferred from the record that defendant has the ability to pay the

aggregate amount of fines and fees from probable future wages, including prison wages.

(*Aviles, supra*, 39 Cal.App.5th at p. 1076; *People v. Ellis* (2019) 31 Cal.App.5th 1090,

1094; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.)

The majority opinion observes that not all inmates are able to work, and that an

inmate's circumstances may change while serving his or her term. While we await the

California Supreme Court's ruling on this issue, I believe *People v. Potts* (2019) 6

Cal.5th 1012 (*Potts*) is persuasive on this particular point. The trial court in *Potts* ordered

a defendant convicted of capital murder to pay the statutory maximum restitution fine of

$10,000, partially based on the probation officer's erroneous statement that a condemned

inmate would be assigned a job in prison. At the time of the hearing, the applicable

restitution statute permitted the court to consider the defendant's inability to pay, but the

defendant did not object. (*Id*. at p. 1055.) Defendant filed a postjudgment motion for the

court to reduce the fine because of the court's mistake and his inability to pay and argued

his own source of income in prison was limited to small financial gifts from family and

friends. The court denied the motion and found that seizing even a small part of

defendant's income was a minimal burden considering the incredible loss he inflicted to

the victim's family. (*Id*. at pp. 1055–1056.)

*Potts* held the trial court abused its discretion when it imposed the fee based on the

erroneous belief that a defendant sentenced to death would be permitted to work.

However, *Potts* held the error was harmless beyond a reasonable doubt based on the court's findings when it denied the postjudgment motion to modify the fine. (*Potts, supra*, 6 Cal.5th at pp. 1055, 1056.) *Potts* explained that the defendant's alleged inability to pay because he lacked a prison job would be "blunted by the fact that he would retain at least some of the money sent to him" by family and friends. (*Id.* at p. 1056.) The trial court was "permitted to conclude that the monetary burden the restitution fine imposed on defendant was outweighed by other considerations," such as the seriousness and gravity of the offense, and the circumstances of its commission. (*Id.* at pp. 1056–1057.)

There is nothing in the record to show that defendant in this case would be unable to satisfy the fines and fees imposed by the court while serving his prison term of 13 years four months, even if he fails to obtain a prison job. While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his prison sentence. (See, e.g., *Potts, supra,* 6 Cal.5th at pp. 1055–1057; *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

I would remand for correction of the abstract of judgment as explained in the majority opinion, and otherwise affirm.


POOCHIGIAN, Acting P.J.

3